IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| COLEEN A. MCNEILL, | ) | CIVIL NO. 11-00679 JMS/BMK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT |
| vs. | ) | KAISER FOUNDATION |
| | ) | HOSPITALS' MOTION FOR |
| KAISER FOUNDATION HOSPITALS, | ) | SUMMARY JUDGMENT ON ALL |
| | ) | REMAINING CLAIMS |
| Defendant. | ) | |
| _____ | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT KAISER FOUNDATION HOSPITALS' MOTION FOR SUMMARY JUDGMENT ON ALL REMAINING CLAIMS

## I. INTRODUCTION

On November 7, 2011, Plaintiff Coleen A. McNeill ("Plaintiff") filed this action against her former employer, Defendant Kaiser Foundation Hospitals ("Defendant"), asserting claims for violations of the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, the Hawaii Whistleblower's Protection Act (the "HWPA"), Hawaii Revised Statutes ("HRS") § 378-61, and for state law torts concerning her alleged disparate treatment and constructive discharge due to her race and disability, and for retaliation.

On September 6, 2012, the court granted in part Defendant's initial Motion for Partial Summary Judgment, dismissing as unexhausted claims for

disability discrimination and for retaliation for reporting allegedly illegal Medicare activities. *See* Doc. No. 49, at 2, 2 n.1. Currently before the court is Defendant's Motion for Summary Judgment on all Remaining Claims. Based on the following, the court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment.

## II.  BACKGROUND

### A.  Factual Background

In February 2004, Plaintiff was hired to work as a Continuing Care Coordinator ("CCC") in Defendant's Utilization Management ("UM") Department. *See* Doc. No. 87, Def.'s Concise Statement of Facts ("CSF") ¶ 1.[1] CCCs ensure appropriate utilization of services for patients, from pre-admission through post-hospitalization. *Id.* ¶ 3. CCCs' patient loads change, depending on admissions and discharges, and physicians' patient assignments. *Id.* ¶ 4. The following facts are relevant to Plaintiff's claims at issue in this Motion:

### 1.  *Plaintiff's Complaints in 2010*

Plaintiff asserts that in April 2010, a social worker employed by Defendant completed a Medicaid application for one of Plaintiff's patients and

---

[1] Where Plaintiff does not dispute a particular fact, the court cites directly to Defendant's CSF.

omitted several intravenous ("IV") medications that the patient was receiving,

which erroneously placed the patient in a lower level of care ("LOC").  Doc. No.

112, Pl.'s Decl. ¶ 11.  Plaintiff questioned staff members regarding this matter, and

ultimately refused to sign the Medicaid application unless it properly listed all IV

medications administered to the patient.  *Id.* ¶¶ 12-14.  On June 25, 2010, Plaintiff

reported this incident to the State of Hawaii Attorney General and to Defendant's

Moral and Ethics Committee.  *Id.* ¶ 15.  On June 29, 2010, Plaintiff discussed this

incident with the Honolulu Medical Fraud Unit and Defendant's compliance

department.  *Id.* ¶ 16.

On July 12, 2010, Plaintiff disagreed with a treating physician

regarding another patient's LOC, and later told the Medicaid placement specialist

working on the patient's Medicaid application that the patient's appropriate LOC

was to a Skilled Nursing Facility ("SNF").  *Id.* ¶ 20.  Despite this information, the

placement specialist documented the patient's LOC as an Intermediate Care

Facility.  *Id.*  As a result, on July 13, 2010, Plaintiff spoke to the Honolulu

Medicaid Fraud Division about this incident, and was informed that an investigator

was assigned to investigate her allegations.  *Id.* ¶ 22.

On July 13, 2010, Plaintiff left work on temporary disability due to

work-related stress.[2]  *Id.*  On October 14, 2010, Plaintiff filed an HCRC/EEOC

Charge alleging race discrimination.  *See* Doc. No. 87-26, Ex. 10 of Def.'s Ex. 16.

### 2.      *Plaintiff's Return to Work*

Plaintiff returned to work on November 1, 2010, at which time she

asserts that her caseload increased dramatically when she was assigned more

patients than normal with a higher LOC than is typically assigned to a CCC.  Doc.

No. 112, Pl.'s Decl. ¶¶ 24-25.  Plaintiff also asserts that she "was scheduled to

work more holidays than any other CCC RNs, which all work assignments were

made by my supervisor."[3]  *Id.* ¶ 17.  Plaintiff further asserts that "during this time

period," a physician partially completed various medical orders, signed them, and

instructed Plaintiff to compete them even though it was outside the scope of her

practice as a registered nurse.  *Id.* ¶ 26.

On February 25, 2011, UM Manager Kon gave Plaintiff a written

---

[2]  Plaintiff asserts that the work-related stress and her leave of absence was "caused by harassment and retaliation for having complained of fraudulent procedures performed by [Defendant]."  Doc. No. 112, Pl.'s Decl. ¶ 23.  From the evidence presented, it remains unclear what particular alleged retaliation occurred prior to Plaintiff's leave of absence.

[3]  CCCs volunteer to work on holidays, clinic closure days, and on-call.  Doc. No. 87, Def.'s CSF ¶ 6.  UM Manager Wendy Kon schedules the on-call scheduling, and if there are insufficient volunteers for holidays and clinic closure days, names are drawn of those who did not work on the holiday the year before.  *Id.*  Under this procedure, Defendant asserts that other CCCs worked just as many holidays and/or clinic closure days as Plaintiff in 2010.  *See* Doc. No. 87-1, Kon Decl. ¶ 10.  Defendant does not, however, address the time period spanning from *after* Plaintiff reported the alleged Medicaid fraud until through her resignation in 2011.

warning for taking thirteen unscheduled absences from work during the period of November 20, 2010 through February 11, 2011. *Id.* ¶ 27. This written warning appears to be the culmination of Plaintiff having numerous absences between 2009 and 2011. For example, in 2009, Plaintiff called in sick twenty-five times, which resulted in Kon noting this absenteeism in Plaintiff's 2009 Performance Appraisal and advising Plaintiff to decrease her sick days to the regional average of nine days per year. Doc. No. 87, Def.'s CSF ¶ 8. By mid-June 2010, however, Plaintiff had already accumulated twelve absences. *Id.* On June 17, 2010, Kon and Josephina Idica, the Senior Employee and Labor Relations Consultant, verbally warned Plaintiff that her attendance must improve and that further poor attendance would lead to formal discipline. *Id.* ¶ 9. In total for 2010, Plaintiff had fifteen unscheduled absences. *Id.* ¶ 11.

During the week of March 30, 2011 through April 6, 2011, a physician ordered the discharge of over six patients under Plaintiff's care. Doc. No. 112, Pl.'s Decl. ¶ 28. Plaintiff asserts that this number of discharges was more than twice the normal number assigned to any other CCC in a one-week period, and the amount of work was excessive because each patient needed placement into a SNF. Further, on April 10, 2011, Plaintiff received a note from her supervisor stating that the paperwork was missing, requiring Plaintiff to redo much of her

work.  *Id.* ¶¶ 28, 30.

On April 11, 2011, Kon provided Plaintiff a self-evaluation form to complete even though her annual evaluation had taken place in February 2011.  *Id.* ¶ 31.  According to Plaintiff, most of the questions did not apply to Plaintiff's position as a CCC.  *Id.* ¶ 31.  In any event, all CCCs receive blank self-evaluation forms to complete.  Doc. No. 87, Def.'s CSF ¶ 5.

According to Plaintiff, during an April 27, 2011 staff meeting, Kon advised the CCCs that Defendant would institute a new policy regarding the use of Parental Control Analgesic ("PCA") pumps in relation to terminally ill "acute" patients transferred to hospice facilities.  Doc. No. 112, Pl.'s Decl. ¶ 32.  Under the new procedure, Defendant would provide its own PCA pumps and narcotic medications to transferring "acute" patients instead of requiring the hospice facilities to provide their own PCA pumps and medications prior to transfer.  *Id.*

On April 28, 2011, Plaintiff was assigned as discharge coordinator for an "acute" patient requiring transportation to a hospice facility, which required implementation of the new procedure.  *Id.* ¶ 33.  Because Plaintiff believed the new procedure lacked accountability for unused narcotics and fell below the proper medical standard of care, she refused to sign the transfer.  *Id.* ¶ 34.  When confronted by the treating physician, Plaintiff "became very stressed about the

entire situation," believing that Defendant was compelling her to violate the standard of care. *Id.* ¶ 35.  As a result, on April 28, 2011, Plaintiff submitted her constructive resignation effective May 9, 2011.[4]  *Id.* ¶ 36.

## B.    Procedural Background

On November 7, 2011, Plaintiff filed her Complaint, which appears to assert claims for: (1) disparate treatment and constructive termination on the basis of race and disability (Count I);[5] (2) hostile work environment on the basis of race and disability and for retaliation (Count II); (3) infliction of emotional distress ("IIED") (Count III); (4) retaliation for Plaintiff's opposing discrimination and for reporting allegedly illegal Medicare activities  (Count IV); (5) defamation (Count V); (6) invasion of privacy (Count VI); and (7) violation of the HWPA (Count VII).

On September 6, 2012, the court entered its Order Granting in Part and Denying in Part Defendant's Motion for Partial Summary Judgment, which left remaining Plaintiff's claims for: (1) disparate treatment and constructive

---

[4]  Plaintiff subsequently made a complaint about this PCA pump policy, which Defendant investigated and could not substantiate.  Doc. No. 87-18, Kaneshiro Decl. ¶¶ 8-9.  According to Defendant, it had not implemented a new policy, but rather was simply discussing a request from Hospice. *Id.* ¶ 9.

[5]  The Complaint includes no "Count I" and instead starts listing claims at "Count II." Given the allegations of the Complaint, however, the court has construed "Count I" as asserting a claim for disparate treatment and constructive termination on the basis of race and disability. Up until the April 1, 2013 hearing, Plaintiff has never asserted otherwise.

termination on the basis of race; (2) hostile work environment on the basis of race; (3) IIED; (4) retaliation in response to Plaintiff complaining of race discrimination; (5) defamation; (6) invasion of privacy; and (7) the HWPA. Doc. No. 49. On December 21, 2012, the parties stipulated to dismissal of Plaintiff's IIED claim. Doc. No. 79.

On December 31, 2012, Defendant filed its present Motion for Summary Judgment on All Remaining Claims. Doc. No. 86. Plaintiff filed her Opposition on March 11, 2013, Doc. No. 106, and Defendant filed its Reply on March 18, 2013. Doc. No. 108. On March 20, 2013, Plaintiff filed a Statement Regarding Claims, acknowledging that several of her claims are not supported by the facts and/or the law. Doc. No. 111. A hearing was held on April 1, 2013.

At the April 1, 2013 hearing, Plaintiff's counsel (for the first time) represented that Plaintiff was asserting a stand-alone claim for constructive discharge. As a result, the court required Plaintiff to file a concise statement outlining her theory for this claim by April 3, 2013. After Plaintiff filed her concise statement, Doc. No. 114, Defendant filed a Supplemental Brief on April 17, 2013, Doc. No. 116, Plaintiff filed a Supplemental Opposition on April 24, 2013, Doc. No. 117, and Defendant filed a Supplemental Reply on April 30, 2013. Doc. No. 118.

## III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## IV. <u>DISCUSSION</u>

Defendant seeks summary judgment on all of Plaintiff's remaining claims. As the briefing and arguments on the Motion make plain, however, what claims are at issue has been a moving target. The court therefore first identifies the claims that Plaintiff currently asserts are at issue in this action, and then addresses the parties' arguments as to those claims.

## A.     Claims at Issue

The claims Plaintiff is asserting in this action have changed with each opportunity Plaintiff has had to clarify them.  By reviewing Plaintiff's changing positions, the court takes this opportunity to definitively outline the claims that Plaintiff currently asserts in this action.

Defendant initially filed its Motion for Summary Judgment addressing the claims that it (and the court) believed were still at issue in this action.[6]  But after Plaintiff filed an Opposition that failed to substantively address several of her claims, the court ordered Plaintiff to file a statement explaining her position regarding her position as to each claim.  Doc. No. 109.  Although Plaintiff conceded that summary judgment should be granted on her claims for defamation, invasion of privacy, and discrimination based on race, Plaintiff asserted that she was still proceeding on hostile work environment and retaliation claims based on Plaintiff engaging in protected activity of reporting Medicaid abuses and filing her HCRC/EEOC Charge asserting race discrimination.  Doc. No. 111.  But as explained in the September 6, 2012 Order, Plaintiff had already agreed to dismissal

---

[6]  As outlined in the court's September 6, 2012 Order, the court believed that Plaintiff's remaining claims were for (1) disparate treatment and constructive termination on the basis of race; (2) hostile work environment on the basis of race; (3) retaliation in response to Plaintiff complaining of race discrimination; (4) defamation; (5) invasion of privacy; and (6) violation of the HWPA.

of the retaliation claims based on her reporting of Medicaid abuses given that they appeared to be unexhausted. *See* Doc. No. 49 at 2 n.1. The court therefore rejects Plaintiff's attempt to revive these claims at this time.

Then, at the April 1, 2013 hearing, Plaintiff's counsel further clarified that her claims for hostile work environment and retaliation were effectively the same claim -- that is, Plaintiff is asserting a hostile work environment based on retaliation for her reporting race discrimination. And, for the first time in this litigation, Plaintiff also asserted that she is stating a constructive discharge claim based on both violation of public policy and the HWPA.

To summarize, Plaintiff seeks to proceed in this action on claims for (1) constructive discharge in violation of public policy; (2) retaliation in response to Plaintiff complaining of race discrimination; and (3) violation of the HWPA. That is, she has conceded that she cannot prevail on her other remaining claims. As a result, the court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's claims for (1) disparate treatment and constructive termination on the basis of race; (2) hostile work environment on the basis of race; (3) defamation; and (4) invasion of privacy. The court now addresses the claims Plaintiff asserts are still at issue in this action.

**B.   Constructive Discharge in Violation of Public Policy**

A constructive discharge based on violation of public policy is a claim that neither Defendant nor the court contemplated Plaintiff was asserting, and it should go without saying that at this stage in the litigation, Plaintiff's claims should be clear to both the court and Defendant.  Rather, it was only at the April 1, 2013 hearing and in her supplemental papers that Plaintiff first argued that she is asserting a claim that she was constructively discharged in violation of public policy as recognized in *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625 (1982).  Specifically, pursuant to *Parnar*, "an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy." *Id.* at 380, 652 P.2d at 631.  Plaintiff raises this argument even though such claim was not enumerated in the Complaint as a specific claim, was not addressed in the first Motion for Summary Judgment (whether in the parties' briefing or listed in the court's resulting Order outlining the remaining claims), and was not even included in Plaintiff's Statement Regarding Claims.  Rather, at the April 1, 2013 hearing, Plaintiff's counsel explained that as he was preparing for the argument, he determined that the Complaint alleged a *Parnar* claim and that he wished to proceed on it.  Defendant argues, and the court agrees, that the Complaint fails to adequately allege such claim, and therefore this claim is not currently part of this

litigation.

Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the Complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *See also McHenry v. Renne*, 84 F.3d 1172, 1180 (9th Cir. 1996) (affirming dismissal of complaint where "one cannot determine from the complaint who is being sued, for what relief, and on what theory, with enough detail to guide discovery"). The Complaint does not include sufficient allegations to meet this standard for several reasons.

First, none of the enumerated claims in the Complaint asserts that Plaintiff was constructively discharged in violation of a clear public policy pursuant to *Parnar*. Plaintiff instead relies on the fact that her Complaint was sloppily drafted and failed to include a "Count I," instead enumerating claims starting with "Count II." Following this logic, Plaintiff asks this court and Defendant to discern what additional claims Plaintiff is asserting based on her lengthy "Statement of Facts" section in her Complaint, which outlines her entire tenure of employment with Defendant. The court rejects this shot-gun approach of pleading -- the factual allegations of the Complaint could arguably suggest any number of claims, and it is not Defendant's (or the court's) job to guess which claims Plaintiff is actually asserting in this action.

14

Second, the factual allegations of the Complaint on their own do not assert a *Parnar* claim in any event.  As to her termination, the Complaint alleges that (1) Defendant instituted a new policy that Kaiser would provide PCA pumps for terminally ill patients being transferred to Hospice facilities; (2) Plaintiff refused to sign off on the transfer of a patient because she believed the new policy posed a safety risk due to a lack of accountability regarding unused narcotics; (3) a doctor confronted Plaintiff after her refusal, which made Plaintiff feel that she was being compelled to violate proper standards of medical care; and (4) she submitted her resignation after this incident.  Compl. ¶ 15u-v.  Yet to allege a *Parnar* claim, a plaintiff must identify a violation of a "clearly defined policy" through conduct that "contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme."  *See Griffin v. JTSI, Inc.*, 654 F. Supp. 2d 1122, 1139 (D. Haw. 2008) (quoting *Parnar*, 65 Haw. at 379, 652 P.2d at 630-31).  These allegations on their own do not assert a *Parnar* claim -- they fail to identify a "clear mandate of public policy" that was violated, and instead assert only Plaintiff's subjective beliefs about Defendant's alleged PCA policy.

Finally, a natural reading of the Complaint's factual allegations along with the enumerated claims is that these allegations are directed to Plaintiff's HWPA claim (Count VII), which asserts that "the discrimination and termination

15

alleged [above] was in violation of [the HWPA] due to Plaintiff's report of a violation of law . . . ." *Id.* ¶ 27.  In comparison, nowhere does the Complaint assert that her termination was a violation of public policy, and nowhere does the Complaint identify any clear public policy that was violated.

In opposition, Plaintiff argues that Defendant was on notice of the *Parnar* claim because Defendant understood that the PCA pump issue was a "final straw" in causing Plaintiff's constructive termination and Defendant addressed Plaintiff's termination in its summary judgment motion.[7]  Doc. No. 117 at 5-7. Contrary to Plaintiff's argument, Defendant addressed Plaintiff's termination as part of Plaintiff's HWPA claim, and did not address whether Plaintiff's alleged constructive discharge was a violation of a clear mandate of public policy. Defendant had no reason to address a *Parnar* claim because the Complaint did not allege one, the parties proceeded on the assumption that the Complaint did not allege one, and it was not until the April 1, 2013 hearing that Plaintiff first asserted such claim.[8]

---

[7]  Plaintiff also argues that the Complaint meets the liberal pleading requirements applicable in Hawaii state cases.  *See* Doc. No. 117 at 10-11.  Needless to say, the court applies the federal standards and Hawaii caselaw on state procedural pleading requirements is irrelevant.

[8]  The parties also argue whether Defendant would be prejudiced if Plaintiff were permitted to assert a *Parnar* claim at this time.  These arguments put the cart before the horse -- the relevant issue at this time is whether the Complaint alleges a *Parnar* claim, and Plaintiff has not sought leave to amend her Complaint to assert such claim.  If Plaintiff wishes to seek leave to

In sum, the court finds that the Complaint fails to given notice, much less allege, a *Parnar* claim.  Because the Complaint fails to assert a *Parnar* claim, Plaintiff cannot now assert these claims in response to a Motion for Summary Judgment.[9]  *See Wasco Prods., Inc. v. Southwall Tech., Inc*., 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." (quotations and citations omitted)).

## C.    Retaliation for Reporting Race Discrimination

An employer may not discriminate against an employee because the employee has opposed an employment practice made unlawful by Title VII.  42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice [prohibited by Title VII] . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) ("Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title

---

amend her complaint in light of this Order, she would need to meet the good cause requirements of Rule 16.

[9] Because the *Parnar* claim is not alleged in the Complaint, the court does not address the parties' substantive arguments regarding the viability of such claim.

17

VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." (citations and quotation signals omitted)).

To make a *prima facie* showing of retaliation, the plaintiff must show that (1) she opposed an employment practice made unlawful by Title VII; (2) the defendant took an adverse action against her; and (3) there was a causal link between her involvement in this opposition and the adverse action taken by the defendant.[10]  *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004).  The *McDonnell Douglas* burden-shifting framework applies to Plaintiff's retaliation claim.  *See McGinest*, 360 F.3d at 1124.  Thus, if Plaintiff establishes a prima facie case of retaliation, the burden shifts to Defendant to offer a legitimate, non-discriminatory explanation for the challenged action.  *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).

Defendant argues that Plaintiff has failed to carry her burden of establishing a prima facie case because there is no evidence suggesting that she suffered an adverse employment action.  According to Defendant, Plaintiff bases

---

[10]  "When responding to a summary judgment motion . . . [the plaintiff] may proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]."  *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004)).  The court proceeds under the *McDonnell Douglas* framework because Defendant presented its argument under the framework, Plaintiff offered no substantive opposition, and there is no direct or circumstantial evidence demonstrating discrimination.

this claim on her assertion that she was required to work more holidays than any other CCCs after filing her HCRC/EEOC Charge, and the only evidence regarding vacation time establishes that other CCCs worked just as many holidays and/or clinic closure days as Plaintiff in 2010. *See* Doc. No. 86-3, Def.'s Mot. at 22; *see also* Doc. No. 87-1, Kon Decl. ¶ 10.

The court rejects this argument. As an initial matter, the evidence that other CCCs worked just as many holidays and/or clinic closure days as Plaintiff in 2010 does not address the relevant time frame -- *i.e.*, after Plaintiff made her complaint in September 2010 through May 2011 when she left. As a result, this evidence does not establish whether Plaintiff worked more vacation days than other CCCs after she filed her HCRC/EEOC Charge. Further, in her Declaration, Plaintiff asserts that she "was scheduled to work more holidays than any other CCC RNs, which all work assignments were made by my supervisor." Doc. No. 112, Pl.'s Decl. ¶¶ 24-25. Although Plaintiff certainly could have provided more detail regarding her assertion that she was forced to work more holidays, Plaintiff's Declaration states facts that would be admissible in evidence. That it is self-serving bears "on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *See SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (quoting *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir.

1999)).[11]

The court therefore DENIES Defendant's Motion for Summary

Judgment on Plaintiff's retaliation claim based on her reporting race

discrimination.

## D.     HWPA

The HWPA makes it unlawful for an employer to retaliate against an

employee-whistleblower.[12]  A plaintiff must establish that: (1) she engaged in

conduct protected by the HWPA; (2) the employer took some adverse action

against her; and (3) a causal connection exists between the alleged retaliation and

the protected conduct.  *See Griffin*, 654 F. Supp. 2d at 1130 (citing *Crosby v. State*

*Dep't of Budget & Fin.*, 76 Haw. 332, 342, 876 P.2d 1300, 1310 (1994)).  Unlike

Title VII, an HWPA claim is not subject to the same burden shifting on summary

---

[11]  Defendant argued only that Plaintiff failed to establish her prima facie case and did not assert a legitimate, non-discriminatory reason for the challenged action.

[12]  Specifically, the HWPA provides:
> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:
>> (1) The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:
>>> (A) A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States . . . .

HRS § 378-62.

judgment, *see id.* at 1131-32, and a plaintiff can survive summary judgment on an

HWPA claim by establishing a genuine issue of material fact on her prima facie

case. *See Mussak v. Hawaii*, 126 Haw. 25, 265 P.3d 494 (Haw. App. Dec. 7, 2011)

(unpublished) (explaining that under *Crosby*, "[t]o defeat the employer's summary

judgment motion, the employee must bring forward some evidence of each element

of his or her HWPA claim."); *see also Griffin*, 654 F. Supp. 2d at 1134.

Defendant argues that Plaintiff has failed to establish a genuine issue

of material fact in support of her prima facie case.  Plaintiff gave minimal effort in

responding to the Motion for Summary Judgment, and relies almost entirely on her

Declaration, which parrots the allegations of the Complaint.  Despite this minimal

effort by Plaintiff, the parties present a very close case.  But viewed in a light most

favorable to Plaintiff, the court finds that a genuine issue of material facts exists

supporting Plaintiff's prima facie case based on her reporting the alleged Medicaid

fraud in June 2010 and when she filed her HCRC/EEOC Charge on October 14,

2010.

First, Plaintiff plainly engaged in protected conduct.  In opposition,

Defendant argues that Plaintiff's reports of alleged Medicaid fraud do not

constitute protected activity because she had no education in Medicaid billing, was

not versed in the relevant regulations and procedures, and was motivated by

personal interests.  Doc. No. 86-3, Def.'s Mot. at 35-36.  The court rejects this argument -- Defendant offers no legal support that a whistleblower must be versed in the law or that a claimant's motivation is relevant under these circumstances.

Second, Plaintiff has established a genuine issue of material fact that Defendant took adverse actions against her.  Plaintiff's Declaration outlines that after she made her Medicaid fraud reports and HCRC/EEOC Charge, she suffered various adverse actions, including, among other things, having her workload increase[13] and being assigned more holidays.  Although largely conclusory, Plaintiff's Declaration is sufficient to support these facts.  *See Phan*, 500 F.3d at 909.

Finally, the timing of the events, viewed in a light most favorable to Plaintiff, raises a genuine issue as to causation.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (explaining that temporal proximity can be sufficient to establish causation only when the adverse action takes place "very close" in time to the protected activity) (citations omitted)); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).  Plaintiff began to experience adverse actions only one month after filing her HCRC/EEOC Charge.

---

[13]  Although it is undisputed that patient loads changed constantly depending on admissions and discharges and that patients were redistributed amongst CCCs each week, *see* Doc. No. 87, Def.'s CSF ¶ 4, such facts fails to negate Plaintiff's assertion that her work load was increased more than normal upon her return.

*See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that series of transfers of job duties that began less than three months after plaintiff filed his first administrative complaint was sufficient to withstand summary judgment).  And although over four months elapsed between Plaintiff's complaints regarding alleged Medicaid fraud and the adverse actions, *see Clark*, 532 U.S. at 273 (noting that a lapse of even three or four months is too long to infer causation), Plaintiff was on a leave of absence for almost all of this time.  As a result, viewed in a light most favorable to Plaintiff, the facts arguably support the inference that Defendant retaliated against Plaintiff at the earliest opportunity provided.

The court finds, however, that Plaintiff has not established a genuine issue of material fact to the extent she now asserts in her supplemental filings that Defendant violated the HWPA when Plaintiff refused to sign off on the transfer of a patient without proper monitoring of the patient's PCA pump.  *See* Doc. No. 114.  First, Plaintiff has presented no evidence suggesting that Plaintiff either reported or was about to report to a public body this incident regarding the PCA pump.  *See* HRS § 378-62.  Rather, the evidence presented establishes that Plaintiff reported her disagreement with this alleged policy internally on her last day of employment.  *See* Doc. No. 87-24, Def.'s Ex. 16 at 169.  And in any event, Plaintiff presented no evidence of any adverse employment action.  The only evidence Plaintiff points to

23

as establishing an adverse action is that a doctor confronted her about her refusal to sign off on the patient, *id*., which simply does not constitute discrimination against Plaintiff regarding her "compensation, terms, conditions, location, or privileges of employment" as required by HRS § 378-62.

The court therefore DENIES Defendant's Motion for Summary Judgment on Plaintiff's HWPA claim to the extent it is based on Plaintiff reporting alleged Medicaid fraud in 2010 and filing a discrimination charge, but GRANTS the Motion to the extent Plaintiff bases her claim on the PCA pump incident.

## V.  CONCLUSION

For the reasons stated above, the court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment on All Remaining Claims.

///

///

///

///

///

///

///

///

Plaintiff's Title VII claim for retaliation for filing the HCRC/EEOC Charge, and

HWPA claim, to the extent based on reporting alleged Medicaid abuses, remain.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 8, 2013.



 /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*McNeill v. Kaiser Found. Hosps.*, Civ. No. 11-679 JMS/BMK, Order Granting in Part and Denying in Part Defendant Kaiser Foundation Hospitals' Motion for Summary Judgment on All Remaining Claims